## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **JENNIFER PARKER,** | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | **Civil Action No:** |
| | ) | |
| | ) | |
| **METROPOLITAN GOVERNMENT** | ) | **Judge _____** |
| **OF NASHVILLE AND DAVIDSON** | ) | |
| **COUNTY, TENNESSEE,** | ) | |
| | ) | **Magistrate _____** |
| **and** | ) | |
| | ) | |
| **MARK SELLS** | ) | **JURY DEMAND** |
| | ) | |
| *Defendants*. | ) | |

## COMPLAINT

1. Plaintiff **JENNIFER PARKER** brings this 42 U.S.C. § 1983 civil rights claim for damages against Defendants **METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE** and **MARK SELLS** alleging violations of Plaintiff's rights under the Fourth Amendment to the U.S. Constitution.

## **PARTIES**

2. Plaintiff **Jennifer Parker ("Ms. Parker")** is a resident of Davidson County, Tennessee.

3. Defendant **Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro")** is a municipal government organized under the laws of the state of Tennessee.

4. Defendant **Mark Sells ("Sells")** is an adult resident of Rutherford County, Tennessee who was at all times relevant to this lawsuit an employee of the Nashville Fire Department, Defendant Metro's municipal fire department.

1

## JURISDICTION AND VENUE

5. This Court has federal question jurisdiction over the federal claims in this matter pursuant to 28 U.S.C. § 1331. Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(2) because all claims related to this case occurred in this district.

## FACTUAL BACKGROUND

### A. Defendant Sells

6. Defendant Sells was employed by Defendant Metro as a "Fire Arson Investigator" with the Nashville Fire Department ("NFD") from June 2013 until February 8, 2022, when Sells abruptly resigned from his position.

7. Prior to his employment with Metro, Sells had worked short stints as a fire investigator at several other municipal Tennessee agencies as well as operating his own private consultancy in the field.

8. From 1995 – 1998, Sells was employed by the Lavergne, Tennessee Fire Department ("Lavergne FD") as an engineer.

9. From 1998 – 1999, Sells was employed by Lavergne FD as a fire inspector.

10. From 1999 – 2002, Sells was employed by the Franklin Fire Department ("Franklin FD") as a Fire Marshal Assistant. On April 17, 2001, Franklin FD verbally reprimanded Sells for responding "emergency traffic" to a situation in violation of the Fire Chief's criteria for such a response. On February 1, 2002, Franklin FD disciplined Sells for violating Franklin FD's policy against "Any act of omission or commission tending to injure the public service, and willful failure of the employee to conduct himself properly." On August 1, 2002, Sells abruptly resigned from Franklin FD.

11. From 2002 – 2006, Sells was employed as a fire investigator by Knox County, Tennessee's fire department ("Knox County FD"). During his tenure there, Knox County FD issued a formal written reprimand against Sells for dishonesty and irresponsibility in the course of his duties. On September 5, 2006, Sells resigned from Knox County FD.

12. From 2006 – 2012, Sells was employed as a Certified Fire Investigator by a private company in Nashville, EFI Global.

13. In 2012, Sells opened his own company, Firetrak Investigations, a private fire investigation company.

14. In 2013, Metro hired Sells to serve as a Fire Arson Investigator. On information and belief, although Sells listed his prior employment in his Metro application, Metro failed to request or collect Sells's past employment files in its hiring process. On information and belief, Sells continued operating Firetrak Investigations while he worked for Metro.

15. On information and belief, from 2016 – 2018 Sells allowed his National Association of Fire Investigators ("NAFI") certification to lapse. However, throughout this period Sells continued testifying in court proceedings that he was NAFI certified.

**B. Jennifer and Kalissa Parker**

16. Jennifer Parker ("Ms. Parker") is a forty-five-year-old mother who works in retail at "Edible Arrangements," a fruit arrangement and gift delivery company.

17. Ms. Parker has two living grown daughters, and one deceased grown daughter, Kalissa. On January 27, 2018, when Kalissa was 18 years old, she tragically committed suicide by setting herself on fire inside Ms. Parker's home.

3

18. Ms. Parker's home at that time was a two-story house on a residential cul de sac in Nashville, Tennessee. She owned the home outright, and did not have homeowner's insurance on the property.

19. At the time of Kalissa's suicide Ms. Parker also had custody of her 4-year-old granddaughter, K.W. K.W. is the daughter of Ms. Parker's other daughter, Kiera.

### C. The period prior to Kalissa's suicide

20. Kalissa had suffered from severe mental health issues and engaged in high risk behaviors for several years prior to her suicide.

21. In December 2015, Kalissa was robbed and raped. By this point Kalissa was already abusing cocaine, marijuana, and Xanax.

22. In January 2016, Kalissa attempted suicide by slitting her wrists, resulting in a six-month inpatient psychiatric commitment. Kalissa was diagnosed with numerous severe mental health and substance abuse disorders and received psychiatric, psychological, and substance abuse treatment.

23. Upon being released to Ms. Parker in July 2016, Kalissa quickly relapsed and began using marijuana again. Kalissa's father, Mr. Parker, then took Kalissa with him to Washington, D.C. to get a fresh start.

24. However, in D.C. Kalissa quickly became non-compliant with her medications, abused illegal drugs, and began prostituting herself.

25. In August 2016, Kalissa had a seizure which her father interpreted as the result of a suicide attempt through the use of a controlled substance.

4

26. In September 2016, Kalissa began exhibiting behaviors that her father considered bizarre, such as standing on the side of the road and complaining that people were staring at her. Kalissa also began running away from home during this period.

27. In November 2016, Kalissa's father took her to the emergency room after a prolonged episode of Kalissa suffering from insomnia and making increasingly bizarre comments such as, "Are you going to kidnap me?", "Are you trying to set me up?", and "Are they looking at me?"

28. In December 2016, Kalissa's father had her hospitalized for a week due to the continued deterioration of her mental health.

29. In March 2016, Kalissa's father again brought Kalissa in for mental health treatment due to her ongoing instability and behavior issues.

30. In July 2017, Kalissa's father again hospitalized Kalissa after she said that she wanted to kill her father, her stepmother, and herself. Kalissa remained in inpatient care for ten days during this hospitalization, once again receiving psychiatric, psychological, and substance abuse treatment.

31. Later that same month, Kalissa's father hospitalized Kalissa yet again, just ten days after she was released from the last hospitalization. This time, Kalissa remained in inpatient care for almost two full weeks.

32. Over the course of 2015 – 2018 Kalissa abused a wide variety of illegal drugs, including cocaine, heroin, marijuana, Xanax, PCP, and other controlled substances. After each inpatient treatment hospitalization, Kalissa quickly relapsed into illegal drug abuse.

33. Over the course of 2015 – 2018 Kalissa got involved with prostitution, which she routinely relied on to get illegal drugs, money, and male attention.

34. At the end of 2017, Kalissa's father determined that he could no longer take care of her, and returned her to live with Ms. Parker.

35. On January 4, 2018, Kalissa turned 18 years old. At that point, Ms. Parker could no longer compel her to receive psychiatric treatment.

36. During the period immediately prior to Kalissa's suicide, she made frequent suicidal statements to friends and family, wrote suicidal social media posts, and wrote suicidal letters that law enforcement would ultimately obtain.

37. During the period immediately prior to her suicide, Kalissa began making statements to friends and family indicative of severe psychosis, for instance asserting that everyone was a "clone" and that her mother (Ms. Parker) was not who she said she was.

38. Throughout January 2018, Ms. Parker attempted to persuade Kalissa to accept mental health treatment. However, Kalissa always refused to accept such treatment, and would run away when Ms. Parker attempted to insist.

39. At one point in January 2018 Ms. Parker contacted Mobile Crisis in an effort to get treatment for Kalissa. However, Mobile Crisis informed Ms. Parker that because Kalissa was an adult Ms. Parker could not require her to get care.

**D. Kalissa's suicide**

40. On January 27, 2018, Ms. Parker, Kalissa, and K.W. were at Ms. Parker's home in Nashville, Tennessee.

41. Shortly before 4 P.M. that afternoon, Ms. Parker and Kalissa got into an argument about Kalissa running off and engaging in high risk behaviors. Ms. Parker ended up taking Kalissa's phone from her to try to prevent her from leaving.

6

42. Ms. Parker went up to her room. She and K.W. both felt sick that day, and Ms. Parker tried to put K.W. down for a nap. Ms. Parker had K.W. sleeping in Ms. Parker's room because of Kalissa's bizarre statements and erratic behaviors.

43. Suddenly, Ms. Parker heard a loud noise from downstairs.

44. Ms. Parker walked out of her room to see what was happening, only to see Kalissa coming around the corner downstairs on the first floor, engulfed in flames.

45. Terrified for herself and for K.W., Ms. Parker ran up to her room to get her phone.

46. Ms. Parker came back out from her bedroom, leaving K.W. in her room. At that point she saw Kalissa walking up the stairs, still engulfed in flames.

47. Still terrified, Ms. Parker ran back to her room, slammed and locked the door, and then called 911.

48. Kalissa attempted to open Ms. Parker's bedroom door twice, then walked to her own bedroom and collapsed on the floor.

49. Within moments, Kalissa burned to death from the flames.

### E. Nashville Fire Department arrival and initial investigation

50. Neighbors witnessed Ms. Parker screaming for help from her bedroom window, and went to the ground below Ms. Parker's window. The neighbors brought a ladder, and a male neighbor went up the ladder as far as he could. Ms. Parker dropped K.W. down to him, and he got K.W. safely away from the house.

51. At approximately 4:09 PM, Nashville Fire Department ("NFD") personnel arrived at Ms. Parker's home in response to her call.

52. The firefighters rescued Ms. Parker, put out the fire, and removed Kalissa's body from Ms. Parker's house.

7

53. Ms. Parker and K.W. were taken to the hospital in an ambulance.

54. At the hospital, a Nashville Fire Marshal interviewed Ms. Parker. Ms. Parker participated in this interview, and gave her account of what had occurred.

55. NFD investigators, including Defendant Sells, arrived and surveyed the scene. The stairs leading from the ground floor to the upstairs were burned, as were parts of Kalissa's bedroom. An empty bottle of torch fuel was found in the garage, as was a lighter.

56. Later on January 27, 2018, Sells completed an NFD report identifying the "Cause of ignition" as "Cause undetermined after investigation," and the "Factors contributing to ignition" as "undetermined."

57. NFD and MNPD began a joint investigation of Kalissa's death and the fire, looking to determine who had caused these events and why.

58. On January 28, 2018, MNPD entered a report classifying Kalissa's death as a suicide.

59. Ms. Parker participated in an interview, explaining what had happened to the investigators.

60. Mr. Parker participated in an interview. During his interview, conducted just days after his daughter's death, Mr. Parker simultaneously acknowledged Kalissa's extensive mental health disorders and suicidal tendencies while simultaneously casting blame on Ms. Parker for not preventing the tragedy.

61. NFD investigator Fred Page interviewed several neighbors, all of whom stated that Ms. Parker was a good neighbor. Several of them also referenced Kalissa's ongoing troubles.

62. MNPD investigators also conducted a recorded interview of a man who had been with Kalissa just two days before her death, when his male friend had to be taken to the hospital because of a drug overdose while he was spending time with Kalissa. The man

described Kalissa to the MNPD investigators as completely lacking in empathy for his friend, who reportedly died from the overdose.

63. On February 6, 2018, an MNPD detective obtained a search warrant for Ms. Parker's residence to collect Kalissa's letters from her sister Kiarra. It was then executed on February 8, 2018.

64. On February 8, 2018, the Tennessee Bureau of Investigation Crime Lab provided a report to NFD Investigator Mark Sells with the results of testing from various samples of carpet, furniture fabric, and cotton balls with fluid from the "tiki torch" container found in Ms. Parker's garage. None of the furniture or carpet samples contained any of the "isoparaffin product" that was on the cotton balls.

65. Also on February 8, 2018, the County Medical Examiner ("Medical Examiner") completed its report from the autopsy of Kalissa's body. The Medical Examiner determined that Kalissa's cause of death was, "Complications of thermal injuries and inhalation of products of combustion." The Medical Examiner also determined that there was active THC in Kalissa's system at the time of her death. Finally, the Medical Examiner determined that the manner of death "could not be determined" due to "uncertainty as to how the fire was started and by whom."

66. On February 9, 2018, an MNPD detective obtained a search warrant for Kalissa's Facebook and Instagram records.

67. Also on February 9, 2018, NFD investigator John Glenn submitted two samples of burned fabric from Kalissa's bedroom to the TBI Crime Lab.

68. On February 13, 2018, an MNPD detective obtained a search warrant to access the contents of two cell phones that Ms. Parker had already turned over to MNPD.

9

69. Also on February 13, 2018, an MNPD detective obtained a search warrant to seize and access the contents of Kalissa's cell phone.

70. Also on February 13, 2018, MNPD Detective Branum entered a report logging the collection and preservation of two cellphones.

71. On February 15, 2018, Sells submitted additional samples to the TBI for analysis – namely additional samples from the staircase, carpet from the living room, and carpet and padding from Kalissa's bedroom.

72. On February 23, 2018, the TBI Crime Lab produced its report after analyzing the additional samples submitted by Glenn on February 9th and Sells on February 15th. The analysis of the burned bedding from Kalissa's room did not reveal any ignitable liquid reside, but the analysis of the other additional samples detected isoparaffin product.

73. On February 28, 2018, MNPD Detective Branum entered property reports logging the collection and preservation of "me photos," "marijuana roaches," a "glass pipe," and a "journ[a]l with multiple letters."

**F. NFD and MNPD continue the investigation for the next three-and-a-half years**

74. Unsatisfied with the explanation that Kalissa had set herself on fire, MNPD and NFD investigators kept the investigation open for the next three and a half years.

75. Under Metro policy and practice, NFD had the authority to decide whether to seek criminal charges against Ms. Parker for arson for the house catching on fire, whereas MNPD had the authority to decide whether to seek homicide charges for Kalissa's death.

76. On August 5, 2018, MNPD Investigator Kenneth Wolfe entered property reports logging the collection and preservation of latent fingerprints.

10

77. On March 12, 2019, MNPD investigators conducted a recorded interview of Kalissa's friend, Isaah Aristide, who stated that he had known that Kalissa was suicidal and that he believed Kalissa had set herself on fire. Aristide told the investigators that Kalissa had been involved with drug use and prostitution, that she was unstable, and that she had made numerous comments about killing herself during the period leading up to her death.

78. On September 19, 2019, the TBI Crime Lab produced a latent fingerprint analysis report indicating that prints taken from the "tiki torch" fluid bottle—which Sells had submitted for testing--matched Kalissa's fingerprints.

79. On November 21, 2019, the search warrants for Kalissa's social media accounts were executed. Kalissa's social media accounts corroborated the claims made by friends and family about Kalissa's instability, high risk behavior, and bizarre statements.

80. On February 8, 2020, the TBI Crime Lab issued a report to NFD Investigator Sells reporting the analysis of samples provided from the NFD's test burns of a mannequin and staircase. The report indicated that a "napthenic/paraffinic solvent" was detected in these test burn samples.

81. On April 1, 2021, MNPD investigators completed a report classifying Kalissa's death as a suicide and closing out MNPD's investigation. The report noted that the evidence was too inconclusive to conclude that Kalissa's death was the result of "foul play," and indicated that if new evidence came to light the case would be reopened for further investigation. The report also reflected that NFD investigators had already concluded that they had probable cause to seek a grand jury indictment against Ms. Parker.

82. On information and belief, between April 1, 2021 and September 22, 2021 NFD Investigator Sells initiated the process to get Ms. Parker indicted for arson charges.

11

83. On September 22, 2021, NFD Investigator Mark Sells went before the Grand Jury and accused Ms. Parker of having knowingly set her uninsured home on fire. On information and belief, Sells's testimony to the grand jury was at least misleading, if not outright false, in several material respects.

84. On information and belief, Sells's grand jury testimony asserted that Kalissa was already dead before the fire started, and falsely claimed that the Medical Examiner's report supported this conclusion. In reality, the Medical Examiner's report concluded that Kalissa died from her burn injuries and identified no other potential cause of her death.

85. On information and belief, Sells asserted to the grand jury that – based on the false premise that Kalissa was already dead before the fire started – Ms. Parker was the only conscious adult in her home at the time of the fire, and thus asserted that Ms. Parker was the only person who could possibly have started the fire.

86. On information and belief, Sells's grand jury testimony either minimized or completely omitted Kalissa's extensive documented history of severe mental health issues, suicide attempts, and suicidal statements.

87. On information and belief, Sells's grand jury testimony asserted that Ms. Parker's statement in the 911 call that Kalissa "ha[d] to be dead" somehow contradicted her subsequent interview statement that before closing and locking her bedroom door Ms. Parker had seen Kalissa walking toward her in flames, notwithstanding the fact that it was a rational inference on Ms. Parker's part that Kalissa would have died shortly after Ms. Parker locked her out of Ms. Parker's bedroom.

88. On information and belief, Sells's grand jury testimony omitted any mention of Kalissa's friend Isaah Aristide's account of Kalissa's acute mental deterioration during the period

12

before her death and his belief, as Kalissa's friend, that Kalissa had indeed committed suicide by setting herself on fire.

89. **On information and belief, Sells's grand jury testimony asserted that** Ms. Parker's fingerprints were found on the Tiki Torch bottle without acknowledging that Kalissa's fingerprints were also found on the bottle.

90. On information and belief, Sells's grand jury testimony asserted that the evidence showed that the fire on the stairs and the fire in Kalissa's bedroom were separate and unconnected, even though NFD photos of the upstairs hallway showed fire patterns and hand-slide patterns that were indicative of a moving, burning body – *i.e.* Kalissa – traveling from the staircase to Kalissa's bedroom while on fire.

91. On information and belief, Sells's grand jury testimony failed to acknowledge that NFD took photos showing that there were burn marks and hand prints on the outside of Ms. Parker's bedroom door, corroborating Ms. Parker's statement that Kalissa had briefly tried to get into her room while she was on fire.

92. On information and belief, Sells's grand jury testimony vaguely and falsely asserted that all of the samples NFD took from Ms. Parker's stairs tested positive for an accelerant, without distinguishing between different types of accelerants. However, in reality the Crime Lab had determined that the one staircase sample included in the Sells's first set of submissions was negative for an accelerant, and that in the second set of samples one was negative, another was positive for "terpenes," and only two were positive for isoparaffins – the type of accelerant detected in the tiki torch fluid.

13

93. On information and belief, Sells's grand jury testimony asserted that the TBI tested just two samples from Kalissa's bedroom, both of which tested positive for "heavy distillate."[1] However, in reality the TBI tested six samples from Kalissa's bedroom. Three came back negative for any accelerant, two came back positive for terpenes, and just one came back positive for isoparaffins.

94. On information and belief, Sells's account to the grand jury of two unconnected fires on the stairs and in Kalissa's bedroom failed to account for the sample of "charred fabric" from the downstairs sectional couch, which made clear that there had also been fire damage in the downstairs area between the garage (where the tiki torch bottle and lighter were found) and staircase.

95. On information and belief, Sells's grand jury testimony referenced a note found in Kalissa's room insinuating that Ms. Parker was a physically abusive mother, but failed to acknowledge Kalissa's letters, notes, text messages, and social media posts expressing her psychotic delusions, suicidal ideations, and homicidal ideations.

96. On information and belief, Sells's grand jury testimony failed to acknowledge that the NFD had not preserved the lighter found in the garage near the tiki torch bottle, and had not taken latent fingerprints from the lighter for analysis.

97. On information and belief, Sells's grand jury testimony falsely asserted that a "fire canine" was at Ms. Parker's house as part of his investigation the night of fire; that the dog "alerted" on the stairs and in Kalissa's bedroom for the presence of accelerants; that those were the only places where the dog alerted for the presence of accelerants

---

[1] This is the term Sells used at Ms. Parker's criminal case bond hearing. Presumably, "heavy distillates" encompass isoparaffin-type products.

throughout the entire house, which contradicted Ms. Parker's account of the events that afternoon; and that he took samples for testing from the places where the dog alerted.

98. On information and belief, to the extent that Sells's process for getting the case against Ms. Parker docketed with the grand jury involved discussions with the District Attorney's Office, the information Sells presented to the D.A.'s office was misleading in the same respects as are detailed at paragraphs 84 – 96 above.

99. On September 23, 2021, the day after Sells testified to the grand jury, MNPD investigators entered a report re-classifying Kalissa's death as "Death-Other." The report noted that there was still "no clear manner of death" for Kalissa, and indicated that MNPD's investigation was being suspended "in the hopes additional information may become available in the future to definitively explain the cause and manner of death."

100. Also on September 23, 2021, MNPD Sgt. Robert Nielsen entered a property report logging the preservation of the recorded interviews with Richard Baskeyfield, the man whose friend had overdosed while Kalissa was with him just a few days before her suicide, and Isaah Aristide, Kalissa's friend that had told investigators about her suicidal statements and mental deterioration leading up to her death.

101. On September 29, 2021, based solely on Sells's grand jury testimony and the falsehoods and material exculpatory omissions expressed therein, the Grand Jury indicted Ms. Parker for felony Aggravated Arson and Aggravated Child Endangerment.

102. On October 1, 2021, Ms. Parker was served with the felony arrest warrant for the NFD's grand jury indictment. Ms. Parker was incarcerated pending trial, with her bond set at $100,000 – an amount far in excess of her financial ability to pay.

103.     That same day, Sells took Ms. Parker's phone from her home. Sells obtained the phone by falsely telling Ms. Parker's daughter that Ms. Parker was asking for it. Based on this lie, Ms. Parker's daughter gave Ms. Parker's phone to Sells.

### G.  Criminal prosecution, Sells's resignation, and eventual *nolle prosequi*

104.     Based on Ms. Parker's financial status, the Davidson County Criminal Court ("Criminal Court") appointed Attorney Dawn Deaner of the Choosing Justice Initiative to serve as criminal defense counsel for her.

105.     On October 7, 2021, Ms. Deaner filed a motion to reduce Ms. Parker's bond to $10,000, a level that Ms. Parker's family could make on Ms. Parker's behalf.

106.     On October 13, 2021, the Criminal Court heard Ms. Parker's bond motion. Ms. Parker's mother testified on her behalf, attesting to her financial circumstances and the fact that Ms. Parker was not a flight or safety risk. The only witness who testified for the State was Defendant Sells. Sells made numerous false and misleading statements to the Criminal Court during this bond hearing, including the same misrepresentations that are detailed *supra* at paragraphs 84 – 96.

107.     Without the aid of being able to review any discovery whatsoever, Ms. Deaner's cross-examination of Defendant Sells was sufficiently damaging that the Criminal Court Judge stated on the record at the conclusion of the hearing that "there are just a lot of holes in the case."

108.     Notwithstanding this skepticism, on November 5, 2021, the Criminal Court Judge issued a written order denying Ms. Parker's bond reduction motion. The Criminal Court Judge justified her ruling primarily by relying on (a) the severity of the criminal charges, which carried up to 60 years in prison, (b) Sells's false claim that Kalissa was dead

16

before the fire started, and (c) Sells's unfounded account about there having been two separate unconnected fires (the stairs and Kalissa's bedroom).

109.    On October 15, 2021, NFD Investigator Sells sought and obtained a search warrant for Ms. Parker's cell phone, which he had unlawfully taken the day of her arrest. Sells's search warrant affidavit provided an identifying number for the Samsung, but provided no other information regarding the phone's connection to the investigation, whose phone it was, or where the phone was located. The affidavit submitted by Sells to obtain this search warrant also contained information that was grossly misleading, in that (a) it asserted that "It is believed the victim to be deceased prior to the fire after the results of the Medical Examiners report" without disclosing that the Medical Examiner's conclusion was that Kalissa died from the fire, and (b) it asserted that Ms. Parker's fingerprints were found on the Tiki Torch bottle without acknowledging that Kalissa's fingerprints were also found on the bottle.

110.    Ms. Parker was incarcerated on the NFD's arson charges for about six weeks, after which her family was finally able to post bond for her.

111.    On December 10, 2021, MNPD Detective Nielsen finally signed the search warrant returns for the seizures of Kalissa's letters and the three cell phones, years after the warrants were actually executed.

112.    In the meantime, on February 8, 2022, Defendant Sells abruptly resigned from the NFD. On information and belief, Sells resigned because he was under investigation for falsely billing Metro for overtime that he had not worked.

113.    In the course of developing Ms. Parker's defense, Ms. Deaner retained both a private investigation firm and an independent fire investigations expert.

17

114.     After reviewing the discovery and Defendant Sells's bond hearing testimony, the independent expert concluded that Sells had made numerous unsupported claims at the bond hearing under oath and concluded that Sells had failed to follow the professional standards outlined in the National Fire Protection Association (NFPA) *Guide for Fire and Explosion Investigations*, 2021 Edition in multiple key respects.

115.     Finally, on December 7, 2022, the State of Tennessee voluntarily took a "nolle prosequi" on the case against Ms. Parker, terminating the prosecution with no finding of guilt against her.

**H.  NFD Policy – or lack thereof – regarding the filing of criminal charges**

116.     On information and belief, at the time that Sells sought and obtained the grand jury indictment against Ms. Parker, the NFD had no policies at all defining the requirements for an investigator to seek criminal charges.  Thus, NFD had no policies requiring investigators to comply with the constitutional requirement that criminal charges only be sought based on probable cause, or requiring investigators to disclose material exculpatory information to the District Attorney's Office, the grand jury, and/or the court when seeking criminal charges.

117.     On information and belief, up to the time that Sells sought and obtained the grand jury indictment against Ms. Parker the NFD had no training program for imparting to NFD investigators the constitutional requirements for initiating criminal charges.  Thus, NFD had no training program to teach investigators the constitutional requirement that criminal charges only be sought based on probable cause, or the requirement that investigators disclose material exculpatory information to the District Attorney's Office, the grand jury, and/or the court when seeking criminal charges.

18

118.    On information and belief, at the time that Sells sought and obtained the various

search warrants involved in this case the NFD had no policies at all defining the

requirements for an investigator to obtain a search warrant.  Thus, NFD had no policies

requiring investigators to comply with the constitutional requirement that search warrants

only be sought based on probable cause, or the requirement that investigators disclose

material exculpatory information in their search warrant affidavits.

119.    On information and belief, at the time that Sells sought and obtained the various

search warrants involved in this case the NFD had no policies at all defining the

requirements for an investigator to obtain a search warrant.  Thus, NFD had no training

program to teach investigators to comply with the constitutional requirement that search

warrants only be sought based on probable cause, or the requirement that investigators

disclose material exculpatory information in their search warrant affidavit.

## CLAIMS FOR RELIEF

### COUNT I: MALICIOUS PROSECUTION IN
### VIOLATION OF THE FOURTH AMENDMENT
### (42 U.S.C § 1983)

#### (DEFENDANTS SELLS AND METRO)

120.    Plaintiff hereby reincorporates paragraphs 1 – 119 by reference.

121.    Defendant Sells initiated a criminal prosecution against Ms. Parker via grand jury

indictment. On September 22, 2021, Defendant Sells testified to the grand jury to get Ms.

Parker indicted for felony Aggravated Arson and Aggravated Child Endangerment.  On

19

information and belief, Sells made numerous misleading and outright false statements to the grand jury as detailed *supra* in order to obtain an indictment against Ms. Parker.

122.     But for Sells's misleading and false claims, Sells lacked probable cause to charge Ms. Parker with the indictment.

123.     Ms. Parker was arrested and incarcerated because of the grand jury indictment initiated by Sells.

124.     On December 7, 2022, the criminal prosecution against Ms. Parker terminated in a *nolle prosequi* without any finding of guilt against Ms. Parker.

125.     By allowing NFD investigators to wield policing power – in particular criminal charging and arrest authority – without any policy or training whatsoever to ensure that this power was utilized within constitutional constraints, Defendant Metro was deliberately indifferent to the obvious risk that NFD investigators would initiate criminal charges in violation of the Constitution.

126.     The Defendants acted under color of law in initiating and maintaining the criminal charges against Plaintiff.

127.     Defendant Sells acted with reckless and intentional disregard for Ms. Parker's constitutional rights.

128.     The false indictment inflicted a prolonged deprivation of liberty, emotional injuries, and financial losses on Ms. Parker.

**REQUEST FOR RELIEF**

**WHEREFORE**, these premises considered, Plaintiff prays:

1. That the Defendants Answer this Complaint within the time provided by law.

2. That this cause be tried by a jury.

3. That judgment for Plaintiff enter against the Defendants on each count.

4. That Plaintiff be awarded nominal damages on all counts.

5. That Plaintiff be awarded compensatory damages in an amount determined by the jury.

6. That Plaintiff be awarded punitive damages in an amount determined by the jury.

7. That Plaintiff be awarded her attorney's fees and reasonable litigation expenses, including expert witness fees, pursuant to 42 U.S.C. § 1988 and F.R. Civ. Pro. 54(d).

8. That the court costs in this matter be taxed to Defendants.

9. That Plaintiff be awarded pre- and post-judgment interest against Defendants.

10. That Plaintiff be awarded all other relief to which it may appear she is entitled in the interests of justice.


Respectfully submitted,

*s/ Kyle Mothershead*
Kyle Mothershead, BPR 22953
Relentless Advocacy, PLLC
2901 Dobbs Ave
Nashville, TN 37211
T: (615) 429-4717 / F: (615) 229-6387
E: kyle@relentlesslaw.com


Dawn Deaner
Choosing Justice Initiative
1623 Haynes Meade Cir.
Nashville, TN 37207
T: (615) 431-3746
E: dawndeaner@cjinashville.org

21